1

**THE WESTON FIRM**
GREGORY S. WESTON (239944)

2
888 Turquoise Street
San Diego, CA 92109

3
Telephone: (858) 488-1672

4
Facsimile: (480) 247-4553
greg@westonfirm.com

5

JACK FITZGERALD (257370)

6
2811 Sykes Court
Santa Clara, CA 95051

7
Telephone: (408) 459-0305

8
jack@westonfirm.com

FILED

2010 JUN 11  P 3: 16

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. OF CALIFORNIA

#4
Pd
ST

9

**BECK & LEE BUSINESS TRIAL LAWYERS**
JARED H. BECK (233743)

10
ELIZABETH LEE BECK (233742)

11
28 West Flagler Street, Suite 555
Miami, FL 33130

12
Telephone: (305) 789-0072
Facsimile: (786) 664-3334

13
jared@beckandlee.com
elizabeth@beckandlee.com

14

ADR

E-filing

15

**Counsel for Plaintiffs**

16

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

17

CV10-02588

18

19

STUART LOGAN, on behalf of himself
and all others similarly situated,

20

Plaintiff,

21

22

v.

23

APPLE INC. and AT&T MOBILITY LLC,

24

Defendants.

25

26

27

28

Case No: _____

Pleading Type: Class Action

**COMPLAINT FOR:**

**VIOLATIONS OF THE FALSE
ADVERTISING LAW;**

**VIOLATIONS OF THE UNFAIR
COMPETITION LAW; AND**

**VIOLATIONS OF THE CONSUMER
LEGAL REMEDIES ACT**

**Jury Trial Demanded**

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW, UNFAIR
COMPETITION LAW, AND CONSUMER LEGAL REMEDIES ACT

1    Plaintiff Stuart Logan, on behalf of himself and all others similarly situated, by and
2  through undersigned counsel, hereby sues Defendants Apple Inc. ("Apple") and AT&T Mobility
3  LLC ("AT&T," together with Apple, "Defendants") and, upon information and belief and
4  investigation of counsel, alleges as follows:

5                               **SUMMARY OF THE ACTION**

6    1.    This case is brought to remedy the harm caused by Defendants' bait-and-switch
7  tactics concerning wireless data service plans exclusively provided by AT&T for the Apple iPad
8  with Wi-Fi + 3G (the "iPad 3G").

9    2.    Specifically, between January 27, 2010 and June 7, 2010, Defendants repeatedly
10  represented, promised, and advertised that iPad 3G owners could purchase a wireless data
11  service plan that provided unlimited data at a cost of $29.99 per month.

12    3.    Defendants further repeatedly represented, promised, and advertised that the
13  unlimited data plan would be available on a pre-paid, no-contract basis, so that iPad 3G owners
14  could activate unlimited 3G data service only when needed.

15    4.    The no-contract, unlimited data plan was billed by Defendants as a "breakthrough
16  deal." Macworld called the plan one of the iPad's "five best surprises,"[1] and it was extremely
17  well-received in the press, and by Apple devotees. Defendants heavily publicized the availability
18  of the no-contract, unlimited data plan for the iPad 3G throughout the Class Period (as defined
19  below).

20    5.    Based on Defendants' repeated representations, promises, and advertisements
21  about the no-contract, unlimited data plan, at least hundreds of thousands of individuals
22  purchased iPad 3Gs—each paying a premium over iPad models fitted only with Wi-Fi—during
23  the period of March 12, 2010 to June 7, 2010.

24    6.    Notwithstanding Defendants' repeated representations, promises, and
25  advertisements concerning the availability of a no-contract, unlimited data plan for the iPad 3G,

26  _____

27  [1] Dan Frakes, "The iPad's five best surprises," Macworld (Jan. 27, 2010), *available at*
http://www.macworld.com/article/145970/2010/01/bestipadsurprises.html.

28                                            1

1    on June 2, 2010, Defendants announced that they were reneging, and cancelling the unlimited
2    data plan as of June 7, 2010. In contrast to their initial marketing blitz, relatively little effort was
3    expended on this announcement.

4    7.    Defendants' cancellation of the no-contract, unlimited data plan had a significant
5    impact on the value of Plaintiff's and the Class Members' iPad 3Gs, as well as the manner in
6    which they can be used.

7    8.    Plaintiff, on behalf of himself and all others similarly situated, seeks relief from
8    the Court for the harm caused by Defendants' blatant, fraudulent, and purposeful bait-and-
9    switch. Plaintiff brings his claims as violations of California's False Advertising Law, Unfair
10   Competition Law, and Consumer Legal Remedies Act.

11   **INTRADISTRICT ASSIGNMENT**

12   9.    The acts and omissions giving rise to Plaintiff's claims occurred in Sonoma
13   County.

14   **JURISDICTION & VENUE**

15   10.   This Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) (The Class
16   Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000
17   exclusive of interest and costs and more than two-thirds of the members of the Class reside in
18   states other than the state of which Defendants are citizens.

19   11.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff
20   resides in and suffered injuries as a result of Defendants' acts in this District, many of the acts
21   and transactions giving rise to this action occurred in this District, and Defendants (1) are
22   authorized to conduct business in this District and have intentionally availed themselves of the
23   laws and markets of this District through the promotion, marketing, distribution, and sale of its
24   products in this District; (2) reside in this District, including one of the Defendant's headquarters;
25   and (3) are subject to personal jurisdiction in this District.

26   12.   In particular, the representations, claims and statements at issue in this case
27   emanated from California. Those statements were first made during an Apple presentation held

28                                    2

1  in San Francisco. The statements were subsequently repeated on Apple's website, which is
2  hosted in California, and in various press releases and advertisements, written and/or produced in
3  California. AT&T's similar representations, claims and statements similarly emanated from
4  AT&T operations and employees based in California, and AT&T's negotiations and contracts
5  with Apple took place and arose, wholly or in large part, with a California corporation.

6                                          **PARTIES**

7        13.     Plaintiff Stuart Logan is a resident of Sebastopol, California.

8        14.     Defendant Apple Inc. is a California corporation with its headquarters and
9  principal place of business in Cupertino, California.

10       15.     Defendant AT&T Mobility LLC is a Delaware corporation with its principal place
11  of business in Atlanta, Georgia. AT&T maintains extensive contacts with the State of California,
12  and in particular with the Northern District. AT&T has operated in California since 1878. The
13  company connected the first telephone call in California, constructed the country's first
14  transcontinental phone line from California, and built California's largest fiber optic network,
15  totaling more than 31,000 miles. Each day, AT&T handles more than 300 million phone calls a
16  day in California.

17       16.     In 2007, AT&T spent more than $8.3 billion in California, including more than $2
18  billion in building and expanding broadband and wireless networks in California. Its 2007
19  California payroll was $3,412,500,000, representing more than 46,500 employees, at all levels,
20  from retail salespersons, to high-level company managers.

21       17.     AT&T paid $1,275,440,000 in local and state taxes in California in 2007. AT&T
22  has hundreds of retail stores throughout California, including over 100 retail stores in this
23  District. It also maintains business operations in Sacramento, San Ramon, San Diego, Agoura
24  Hills, Newport Beach, Los Angeles, Fresno, and San Francisco, including finance, advertising,
25  and account management operations. 100% of residential customer locations in California have
26  access to AT&T broadband service.

27

28                                             3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL ALLEGATIONS

### THE IPAD 3G

18.     On January 27, 2010, Apple announced the release of the iPad.

19.     The iPad is a 1.5-pound, high-resolution, LED-backlit, in-plane switching (IPS), 9.7-inch display featuring a touch screen and powered by an Apple-designed microchip. It is a half-inch thick and is similar to an Apple iPod, but the size of a standard notepad. The regular, non-3G iPad is fitted with Wi-Fi connectivity; thus, to connect to the internet, its users must be within range of a wireless internet "hotspot." It retails for $499 (16-gigabyte version), $599 (32-gigabyte version), or $699 (64-gigabyte version).

20.     On January 27, 2010, Apple concurrently announced the release of the iPad 3G, which shares all of the regular iPad's features, but also includes internet connectivity through the 3G network, a cellular telecommunication standard. The iPad 3G retails for between $629 (16-gigabyte version), $729 (32-gigabyte version), or $829 (64-gigabyte version). Thus, the iPad 3G is sold at a premium of $130 over the standard iPad.

21.     AT&T is the exclusive United States provider of iPad 3G wireless data service.

### THE NO-CONTRACT, UNLIMITED DATA PLAN

22.     At the same time Apple announced the release of the iPad 3G, Defendants also announced the release of wireless data service plans to be provided exclusively by AT&T on its 3G network.

23.     Specifically, Defendants represented, promised, and advertised that iPad 3G owners would be able to purchase an unlimited data plan for $29.99 per month, which could be activated month-by-month without a contract. Alternatively, iPad 3G owners could purchase a 250-megabyte plan for $14.99 per month.

24.     Thus, if iPad 3G owners needed the unlimited plan one month, they could switch it on; if they did not need it the next month, they could switch it off entirely, or opt for the $14.99, 250-megabyte plan; and if they needed it the third month, they could switch back to unlimited service. In other words, iPad 3G owners could jump between plans each month, or

4

1   have no 3G plan at all, based upon their needs and budget. Thus, iPad 3G owners would be able
2   to purchase the most expensive, unlimited plan during months of heavy usage (for example,
3   while travelling in the United States), while reverting to a cheaper plan or no 3G service at all
4   during months of lighter usage.

5       25.     The value and freedom that the no-contract, unlimited plan represented—billed a
6   "breakthrough deal" between Apple and AT&T—was a major selling point of the iPad 3G.
7   Plaintiff and the Class Members relied on Defendants' representations, promises, and
8   advertisements that the plan would be available in deciding to purchase their iPad 3Gs.

9                           **THE BAIT-AND-SWITCH**

10  **Apple's Representations, Promises And Advertisements Concerning The No-Contract,**
11  **Unlimited Data Plan**

12      26.     Apple announced the release of the iPad 3G in a video presentation given by
13  Apple's CEO, Steve Jobs, which was hosted on Apple's website (the "January 27th Apple iPad
14  Presentation"). During that presentation, Jobs made the following representations and promises
15  about wireless data plans for the iPad 3G:

16      *Now, what does it cost for the data plans? Well, in the U.S., telecom companies*
17      *usually charge about $60 a month for a data plan for a laptop. We've got a real*
18      *breakthrough here. We've got two awesome plans for iPad owners. The first one*
19      *gives you up to 250 megabytes of data per month. That's a fair bit of data. Most*
20      *people will get by on that. Up to 250 megabytes of data per month, just $14.99.*
21      *$14.99. And if you feel you need more, we have an unlimited plan for just $29.99.*
22      *So these are real breakthrough prices. We've got a breakthrough deal with*
23      *AT&T. It's providing the service. $14.99 for up to 250 megabytes, $29.99 for*
24      *unlimited data. . . . And, there's no contract, it's prepay.[2]*

25

26  [2]The video is available online at
27  http://www.youtube.com/watch?v=C7XtZKn6kt8&feature=related. The quoted excerpt begins at
    6:57.

28                                          5

Breakthrough deal with AT&T
$14.99 for up to 250 MB
$29.99 for unlimited data
Free use of AT&T WiFi hotspots
Activate on iPad
No contract – cancel anytime

27.     Between approximately January 27, 2010 and June 7, 2010, Apple maintained a webpage titled, "iPad with Wi-Fi + 3G. The best way to stay connected." That webpage similarly represented, promised, and advertised the availability of a no-contract, unlimited data plan for the iPad 3G:

//
//
//
//
//
//
//
//
//
//

6

Apple - iPad - Stay connected everywhere you go.

www.apple.com/ipad/3g

| Store | Mac | iPod | iPhone | **iPad** | iTunes | Support |

### iPad

# iPad with Wi-Fi + 3G. The best way to stay connected.



#### Take a network with you wherever you go.

iPad with Wi-Fi + 3G offers super-fast data speeds up to 7.2 Mbps over 3G cellular networks around the world. It's perfect when you're out and about with no access to a Wi-Fi network, because you can still get a fast connection for surfing the web, emailing and reviewing email, or getting directions. Since iPad seamlessly switches between 3G and even faster Wi-Fi, you always get the best connection available. And with AT&T data plans, you'll have access to over 20,000 Wi-Fi hotspots including Starbucks, Barnes and Noble, and more.

#### No-contract 3G service.

In the United States, 3G service is available through a breakthrough deal with AT&T. You choose the amount of data per month you want to buy — 250MB or unlimited. If you choose the 250MB plan, you'll receive onscreen messages as you get close to your monthly data limit so you can decide whether to buy a 250MB or upgrade to the unlimited plan. Best of all, there's no long-term contract. So if you have a business trip or vacation approaching, just sign up for the month you'll be traveling and cancel when you get back. You don't need to visit a store to get 3G service. You can sign up, check your data usage, manage your account, or cancel your service — all from your iPad.

| AT&T 3G Data Plans for iPad | |
|---|---|
| Data per month | Price per month |
| 250MB | $14.99 |
| Unlimited | $29.99 |

**Sign up, monitor, and manage your 3G service — all from your iPad.**

7

28.     The section of the Apple webpage pictured above titled "No-contract 3G service"

reads:

In the United States, 3G service is available through a breakthrough deal with

AT&T. You choose the amount of data per month you want to buy—250MB or

unlimited. If you choose the 250MB plan, you'll receive onscreen messages as

you get close to your monthly data limit so you can decide whether to turn off 3G

or upgrade to the unlimited plan. Best of all, there's no long-term contract. So if

you have a business trip or vacation approaching, just sign up for the month you'll

be traveling and cancel when you get back.

29.     The Apple webpage pictured above includes an inset table, which reads:

**AT&T 3G Data Plans for iPad**

| Data per month | Price per month |
|----------------|-----------------|
| **250MB**      | **$14.99**      |
| **Unlimited**  | **$29.99**      |

One month is based on 30 consecutive days, and starts
at the date and time of your purchase.

30.     Apple made further representations, promises, and advertisements about the availability of the no-contract, unlimited data plan for the iPad 3G in e-mails, press releases, and other advertisements. Such representations, promises, and advertisements were always the same, and as described above in paragraphs 26-29, throughout the period from January 27, 2010 to June 7, 2010.

**AT&T's Representations, Promises And Advertisements Concerning The No-Contract, Unlimited Data Plan**

31.     On or about January 27, 2010, AT&T released a "fact sheet" concerning wireless data plans for the iPad 3G, which featured the same no-contract, unlimited data plan discussed above:

//

//

8



AT&T is offering simple and straightforward 3G pre-paid data plans for iPad – complete with easy, on-device activation and management. Data plans for iPad include access to more than 20,000 AT&T Wi-Fi Hot Spots nationwide at no additional cost. Check out 3G plans for iPad, and some helpful Q&A, below.

## Domestic Data Plans for iPad
*Recurring monthly charge with no long term contract*

- $14.99 per month for 250 MB
- $29.99 per month for unlimited data
- Unlimited access – no added cost – to AT&T's 20,000+ Wi-Fi Hot Spots

✓ One month is based on 30 consecutive days, and starts at the date and time of your purchase
✓ Charges will appear on credit card bill
✓ Change domestic data plan at any time
✓ Visit Settings>Cellular Data on iPad to check data use

**How do I manage my 3G plan for iPad? Can I turn service off or change my plan?**
Once you sign up for iPad 3G data service, you can add to or cancel your domestic plan at any time – no penalty. For domestic plans, if you do not cancel, your service will automatically renew every 30 days to provide a more seamless data experience on an ongoing basis. For example, if you activate service on May 9, your service will automatically renew 30 days later with the same plan. If you do make a change, a new 30-day window begins.

**What happens if I exceed the amount of data in my selected plan before the end of one month?**
With the on-device management system, you can check your data usage in Settings>Cellular Data on your iPad at anytime. Also, for the $14.99 plan, iPad will even let you know when you're about to reach your 250 MB data limit. You'll get three alerts — at 20 percent, 10 percent, and zero. With each alert, you can choose to add more data or wait and do it later.

If you do exceed the amount of data in your plan, your plan will expire but it's easy to add another one. Also, with domestic plans, you can wait until the 30[*] day from your purchase when your plan will automatically renew going forward.

For additional support, visit www.apple.com/ipad/3g

*Based on non-municipal company owned and operated sites.*
*3G Services not available in all areas. For terms and conditions visit www.att.com for Wireless Service Terms Session Based Wireless Data Services Agreement.*

9

1    32.    AT&T made identical representations about the no-contract, unlimited data plan
2  for the iPad 3G in e-mails, press releases, its webpage, and in-store advertisements. Such
3  representations were always the same, and as described above in paragraph 31, throughout the
4  period from January 27, 2010 to June 7, 2010.

5  **Defendants Cancel The No-Contract, Unlimited Data Plan**

6    33.    On June 2, 2010, approximately three months after Apple began taking pre-orders
7  for iPad 3Gs on March 12, 2010, and approximately one month after Apple began shipping pre-
8  ordered iPad 3Gs and selling them in its retail stores on April 30, 2010, Defendants reneged on
9  their promise of a no-contract, unlimited data plan for the iPad 3G.

10    34.    Instead, customers who activated an iPad 3G before June 7 can currently opt for
11  an unlimited data plan only so long as they keep the plan *every* month, without even a day of
12  interruption. Thus, this "grandfathering" rule forces customers to keep an unlimited plan
13  continuously active to avoid losing it, *i.e.*, to enter into a *de facto* long-term contract. Once the
14  plan is deactivated, even for a single day, the unlimited data option disappears forever.
15  Consumers who activate an iPad 3G on or after June 7—even if they purchased the iPad 3G
16  before June 7—are excluded entirely from the an unlimited data plan, even one missing the no-
17  contract option.

18    35.    Because Defendants cancelled the plan just over 30 days after pre-ordered iPad
19  3Gs began shipping, individuals who pre-ordered iPad 3Gs are unable to return their devices
20  because the return period has now expired. This timing was done purposefully, to minimize the
21  cost to Defendants of such returns.

22    36.    As a result of Defendants cancelling the no-contract, unlimited data plan, it is
23  literally *impossible* for any iPad 3G owner—even "grandfathered" owners—ever to take
24  advantage of the start-and-stop feature that Defendants represented, promised, and advertised
25  from January 27, 2010 to June 7, 2010.

26    37.    Under a new plan called "DataPlus," iPad 3G owners will receive 200 megabytes
27  of data for $15 per month (a plan 20% more expensive than the previously-announced plan,

28

10

1  which would provide an extra 50 megabytes of data for the same price). If customers exceed 200
2  megabytes of data in a monthly billing cycle, they will automatically be billed an additional 200
3  megabytes of data usage for $15.

4  38.  Alternatively, under a new plan called "DataPro," iPad 3G owners will receive
5  two gigabytes of data for $25 per month. If customers exceed two gigabytes of data in a monthly
6  billing cycle, they will automatically be billed an additional one gigabyte of data usage for $10.

7  39.  Many of the applications and activities for which the iPad 3G is most useful, and
8  for which it is and was heavily marketed—like watching movies and listening to internet radio—
9  will quickly exceed the limits of AT&T's DataPlus and DataPro Plans, and cause "automatic" re-
10  ups and additional billing that would not have existed under the no-contract, unlimited data plan.

11  **Defendants Represented, Promised And Advertised The No-Contract, Unlimited Data Plan**
12  **With No Intention To Honor It**

13  40.  Notwithstanding their early announcements and promises of the no-contract,
14  unlimited data plan for the iPad 3G, Defendants never actually intended to offer iPad 3G owners
15  such a plan. Instead, Defendants intentionally misrepresented the availability of the no-contract,
16  unlimited data plan in order to induce Plaintiff and the Class Members to purchase the iPad 3G
17  and thereby (a) drive up iPad 3G sales, and (b) be locked-in to actual wireless data service plan
18  rates that are far less valuable than Defendants represented and promised.

19  41.  Defendants were aware, well before announcing the change to the iPad 3G
20  wireless data service plans, that the no-contract, unlimited data plan was not feasible, and would
21  not actually be offered, notwithstanding their promises.

22  42.  For example, during a December, 2009 UBS conference in New York, AT&T
23  CEO Ralph de la Vega told investors that it was inevitable that high-bandwidth users on AT&T's
24  3G network will be charged for what they use. According to de la Vega, bandwidth-hungry
25  devices, like the Apple iPhone 3G, have resulted in poor quality service on AT&T's 3G network,
26  including dropped calls and slow data.

27

28  11

1    43.    As of at least December, 2009, AT&T was aware of reports that showed 40% of
2  its 3G network capacity is used by just 3% of smartphone users, with most bandwidth going to
3  activities like streaming audio and video, available through various applications for download on
4  the Apple iPhone 3G, and that iPhone 3G users consume 10 times the bandwidth of typical
5  smartphone users.

6    44.    In light of these reports, de la Vega told investors that AT&T will give high-
7  bandwidth users incentives to "reduce or modify" their usage.

8    45.    At around the same time, AT&T was internally considering cancelling the
9  availability of unlimited data plans for the Apple iPhone.

10    46.    Notwithstanding the problems AT&T recognized with respect to the Apple
11  iPhone 3G, AT&T represented that it had the ability to and would offer cheap, *unlimited* data to
12  users of the iPad 3G—a device that is designed and marketed for its ability to *consume* data
13  constantly, even more than the iPhone.

14    47.    Defendants knew when they made such representations that AT&T could not
15  feasibly offer the no-contract, unlimited data plan, and had no intention of doing so. Instead,
16  Defendants misrepresented the availability of the plan in order to induce Plaintiff and the Class
17  Members to purchase iPad 3Gs, and thereby drive up the sales of iPad 3Gs and be locked-in to
18  wireless data service through AT&T, at much greater rates than advertised.

19    48.    The sweeping change in the iPad 3G wireless data service plans was not decided
20  upon by and among Defendants overnight or soon before their announcement on June 2, 2010;
21  rather, Defendants were well aware, by the time the iPad 3G was available for pre-order on
22  March 12, 2010, that the wireless data service plans would be switched, and that the no-contract,
23  unlimited data plan would be cancelled.

24    49.    Defendants nevertheless represented, promised, and advertised the no-contract,
25  unlimited data plan in order to increase pre-orders and purchases of the iPad 3G and drive up
26  sales of both the iPad 3G and AT&T's wireless data service plans for the iPad 3G.

27

28                                                  12

1    50.    As a result of Defendants' advertising practices, Apple sold approximately 2
2  million iPads in 59 days, that is, approximately one iPad every 3 seconds, a significant portion of
3  which were the iPad 3G models.

4    51.    In sum, Apple and AT&T sold iPad 3Gs under false pretenses from March 12,
5  2010, through June 7, 2010.

6                           **PLAINTIFF-SPECIFIC ALLEGATIONS**

7    52.    Plaintiff Stuart Logan is a Resident of California who pre-ordered an iPad 3G
8  from an Apple on April 19, 2010, paying $729 before tax and shipping for the 32-gigabyte
9  model. He received the iPad, shipped to him from Apple, located at 2911 Laguna Boulevard, Elk
10  Grove, California 95758, on or about April 30, 2010.

11    53.    After receiving his iPad 3G, Mr. Logan activated the AT&T no-contract,
12  unlimited wireless data service plan at a cost of $29.99 for 30 days.

13    54.    Mr. Logan is currently outside the period in which he may return his iPad 3G for
14  a refund. Even if he were within the 14-day return period, which has also expired for all Class
15  Members, he would have been subject to a 10% restocking fee.

16    55.    Prior to ordering his iPad 3G, Mr. Logan watched the January 27th Apple iPad
17  Presentation. Mr. Logan relied on the representations and promises made in the January 27th
18  Apple iPad Presentation of the available wireless data service plans for the iPad 3G, in deciding
19  to purchase his iPad 3G and, in particular, the representation that Apple and AT&T had entered
20  into a "breakthrough deal" for unlimited data service.

21    56.    Prior to ordering his iPad 3G, on January 27, 2010, Mr. Logan received a new
22  product e-mail from Apple, with the subject line, "Introducing iPad." That email included a link
23  to a webpage on the Apple.com website titled "iPad with Wi-Fi + 3G. The best way to stay
24  connected" (described and pictured above in paragraph 27). Mr. Logan relied on the
25  representations and promises of the available wireless data plans for the iPad 3G contained in the
26  "Introducing iPad" email and linked "iPad with Wi-Fi + 3G. The best way to stay connected"

27

28                                    13

1 website, and in particular on the availability of the no-contract, unlimited data plan, including its
2 switch-on-and-off feature, in deciding to purchase his iPad 3G.

3      57.     Prior to ordering his iPad 3G, from approximately January 27, 2010 to April 19,
4 2010, Mr. Logan regularly read a website that aggregates news stories concerning Apple,
5 http://www.macsurfer.com. During that period, Mr. Logan read several articles, including
6 articles from news sources such as *Time* and *Fortune* about the iPad 3G, including the option for
7 250 megabytes of data for $14.99 per month, or unlimited data for $29.99 per month, which
8 required no long-term contract, and which included a switch-on-and-off feature. The information
9 for those articles was provided by Apple and AT&T through press releases and interviews, with
10 the intention of inducing consumer reliance. Mr. Logan relied on the representations, promises,
11 and advertisements of the available wireless data plans for the iPad 3G, and in particular on the
12 availability of the no-contract, unlimited data plan, including the switch-on-and-off feature, in
13 deciding to purchase his iPad 3G.

14      58.     Prior to ordering is iPad 3G, from approximately January 27, 2010 to April 19,
15 2010, Mr. Logan saw online and in-store advertisements and information provided by AT&T
16 which represented and promised the availability of the no-contract, unlimited data plan for the
17 iPad 3G. Mr. Logan relied on the representations, promises, and advertisements of the available
18 wireless data plans for the iPad 3G, and in particular on the availability of the no-contract,
19 unlimited data plan, including the switch-on-and-off feature, in deciding to purchase his iPad 3G.

20      59.     Before receiving his iPad 3G, on May 1, 2010, Mr. Logan received an email from
21 Apple with the subject line, "Thanks for purchasing your iPad." The email included a section
22 called "Setting up 3G service is easy," which included a hyperlink titled "Learn more"(indicated
23 in the portion circled below). Clicking the link lead to the same webpage described and pictured
24 above in paragraph 27, *i.e.*, the website on Apple.com titled "iPad with Wi-Fi + 3G. The best
25 way to stay connected."

26 //

27 //

28           14

1

2

**From:** Apple <News@insideApple.Apple.com>
**Date:** May 1, 2010 6:56:44 AM PDT
**To:** Stuart Logan (email address redacted)
**Subject: Thanks for purchasing your iPad.**

3

4

5



6

7

## Welcome to iPad.
We can't wait to
show you around.

8

9



Learn about your iPad with video
guided tours:

10

11

12

Discover apps made specifically for iPad.          Play favorites from the iTunes Store.

13



Browse the App Store.

14

15



Download the free iBooks
app.

16

Learn about iPad from    Find accessories for your
our experts.                iPad.



17

Get three great apps for getting
things done.

18



19

20

Setting up 3G service is easy.

21

          

22

A few handy iPad tips.

23

24

        

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW, UNFAIR
COMPETITION LAW, AND CONSUMER LEGAL REMEDIES ACT

60.     Mr. Logan relied on the representations and promises of the available wireless data plans for the iPad 3G contained in the "Thanks for purchasing your iPad" email and linked "iPad with Wi-Fi + 3G. The best way to stay connected" website, and in particular on the availability of the no-contract, unlimited data plan, including its switch-on-and-off feature, in deciding to keep, and not cancel, his order for an iPad 3G.

61.     Mr. Logan would not have purchased his iPad 3G but for Defendants' representations, promises and advertisements of the no-contract, unlimited data plan, and its switch-on-and-off feature. In particular, this plan fit his work (which requires periods of extended travel throughout the year) and lifestyle in such a manner that ownership of the iPad 3G was feasible and beneficial. Following the cancellation of the no-contract, unlimited data plan, Mr. Logan's use and enjoyment of his iPad 3G is substantially altered and diminished, to the point that Mr. Logan would elect, if he could, to return the iPad 3G for a refund.

### CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action on behalf of himself and all others similarly situated on behalf of the following Class:

> All persons (excluding officers, directors and employees of AT&T and Apple) who purchased, between January 27, 2010 and June 7, 2010 (hereinafter, the "Class Period") an Apple iPad Wi-Fi + 3G in the United States for their own use, rather than resale or distribution.

63.     Questions of law and fact common to Plaintiff and the Class include:

    a.    Whether Defendants contributed to, committed, and/or are responsible for the conduct alleged herein;

    b.    Whether Defendants' conduct constitutes the violations of law alleged herein;

    c.    Whether Defendants active willfully, recklessly, negligently, or with gross negligence in the violations of law alleged herein; and

1       d.     Whether Class Members are entitled to, restitution, injunctive relief and

2              other equitable relief.

3       64.    By purchasing the iPad 3G, all Class members were subjected to the same

4   wrongful conduct.

5       65.    Absent Defendants' deceptive claims and fraudulent omissions, Plaintiff and

6   Class Members would not have purchased the iPad 3G.

7       66.    Plaintiff's claims are typical of the Class's claims. Plaintiff will fairly and

8   adequately protect the interests of the Class, has no interests that are incompatible with the

9   interests of the Class, and has retained counsel competent and experienced in class action

10  litigation.

11      67.    The Class is sufficiently numerous, including at least hundreds of thousands of

12  individuals who purchased the iPad 3G throughout the United States during the Class Period.

13      68.    Class representation is superior to other options for the resolution of the

14  controversy. The relief sought for each Class Member is small. Absent the availability of class

15  action procedures, it would be infeasible for Class Members to redress the wrongs done to them.

16      69.    Defendants have acted on grounds applicable to the Class, thereby making

17  appropriate final injunctive relief or declaratory relief concerning the Class as a whole.

18      70.    Questions of law and fact common to the Class predominate over any questions

19  affecting only individual members.

20      71.    Class treatment is appropriate under Fed. R. Civ. P. 23(a) and 23(b)(2). Plaintiff

21  does not contemplate class notice if a class is certified under Fed. R. Civ. P. 23(b)(2), which does

22  not require notice, but contemplates notice via publication if the Court determines class notice is

23  required. Plaintiff will, if notice is required, confer with Defendants and seek to present the Court

24  with a stipulation and proposed order concerning the details of a class notice plan.

25  //

26  //

27  //

28                                        17

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW, UNFAIR
COMPETITION LAW, AND CONSUMER LEGAL REMEDIES ACT

1

## FIRST CAUSE OF ACTION

2

**Violations of the California False Advertising Law,**

3

**Bus. & Prof. Code §§ 17500 *et seq.***

4      72.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as

5  if set forth in full herein.

6      73.    In violation of Bus. & Prof. Code §§ 17500 *et seq.*, the advertisements and

7  practices described herein were designed to, and did, result in the purchase of iPad 3Gs which

8  were of a value substantially below that advertised.

9      74.    Defendants knew and reasonably should have known that the advertisements and

10  practices described herein were untrue and/or misleading.

11      75.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive

12  and equitable relief, restitution, and an order for the disgorgement of funds by which Defendants

13  were unjustly enriched.

14

## SECOND CAUSE OF ACTION

15

**Violations of the California Unfair Competition Law,**

16

**Bus. & Prof. Code §§ 17200 *et seq.***

17      76.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as

18  if set forth in full herein.

19      77.    Bus. & Prof. Code §§ 17200 *et seq.* prohibits any "unlawful, unfair or fraudulent

20  business act or practice."

21      78.    The acts, omissions, misrepresentations, practices, and non-disclosures of

22  Defendants as alleged herein constitute "unlawful" business acts and practices in that

23  Defendants' conduct violates the False Advertising Law, and the Consumer Legal Remedies Act.

24      79.    The acts, omissions, misrepresentations, practices, and non-disclosures of

25  Defendants as alleged herein constitute "unfair" business acts and practices in that Defendants'

26  conduct is immoral, unscrupulous, and offends public policy. Further, the gravity of Defendants'

27  conduct outweighs any conceivable benefit of such conduct.

28

18

1    80.    The acts, omissions, misrepresentations, practices and non-disclosures of
2 Defendants as alleged herein constitute "fraudulent" business acts and practices in that
3 Defendants' conduct has a tendency to deceive the Class and the general public.

4    81.    By violating the California Unfair Competition Law, Defendants also violated the
5 common law of unfair competition.

6    82.    In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining
7 Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts
8 and practices and to commence a corrective advertising campaign.

9    83.    Plaintiff further seeks an order for the disgorgement and restitution of all monies
10 from the sale of iPad 3Gs, which were acquired through acts of unlawful, unfair, and/or
11 fraudulent competition.

12                              **THIRD CAUSE OF ACTION**

13                    **Violations of the Consumer Legal Remedies Act,**

14                            **Cal. Civ. Code §§ 1750 *et seq.***

15    84.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as
16 if set forth in full herein.

17    85.    Cal. Civ. Code §§ 1750 *et seq.* prohibits deceptive practices in connection with
18 the conduct of a business that provides goods, property, or services primarily for personal,
19 family, or household purposes.

20    86.    Defendants' policies, acts, and practices were designed to, and did, result in the
21 purchase of iPad 3Gs primarily for personal, family, or household purposes, and violated, and
22 continue to violate the following sections of the CLRA:

23              e.    § 1770(a)(5): representing that goods or services have characteristics,
24                    uses, benefits or quantities which they do not have;

25              f.    § 1770(a)(7): representing that goods or services are of a particular
26                    standard, quality, or grade, or that goods are of a particular style or model,
27                    if they are of another;

28                                          19

1                g.     § 1770(a)(9): advertising goods or services with intent not to sell them as

2                     advertised;

3                h.     § 1770(a)(10): advertising goods or services with intent not to supply

4                     reasonably expectable demand, unless the advertisement discloses a

5                     limitation of quantity; and

6                i.     § 1770(a)(16): representing that the subject of a transaction has been

7                     supplied in accordance with a previous representation when it has not.

8       87.     The conduct described herein by Defendants was done for profit as a deliberate

9 corporate policy rather than an isolated incident, and was morally wrong, fraudulent, callous, and

10 oppressive.

11       88.     As a result, Plaintiff and the Class have suffered irreparable harm, seek, and are

12 entitled to injunctive relief and restitution.

13       89.     In compliance with Cal. Civ. Code § 1782, Plaintiff sent written notice to Apple

14 and AT&T of his claims on June 11, 2010.

15                                **PRAYER FOR RELIEF**

16      WHEREFORE, Plaintiff, on behalf of himself, all others similarly situated, and the

17 general public, prays for judgment and relief against Defendants as follows:

18      A.     Declaring this action to be a proper class action;

19      B.     An Order directing Apple to accept from Plaintiff and the Class Members returns

20 of any iPad 3Gs purchased during the Class Period, for full refund, with no restocking fee, for a

21 period of six (6) months following the date of any such Order;

22      C.     An Order enjoining Defendants from preventing Plaintiff and the Class Members

23 from taking advantage of the no-contract, unlimited data plan Defendants promised and

24 advertised, for a period of two (2) years, or whatever period the Court deems reasonable;

25      D.     An Order requiring Defendants to disgorge all monies, revenues, and profits

26 obtained by means of any wrongful act or practice;

27

28                                  20

1        E.      An Order requiring Defendants to pay restitution to restore all funds acquired by

2  means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent

3  business act or practice, untrue or misleading advertising, or a violation of the CLRA, plus pre-

4  and post-judgment interest thereon;

5        F.      Costs, expenses and reasonable attorneys' fees; and

6        G.     Any other and further relief the Court deems necessary, just, or proper.

7                                    **JURY DEMAND**

8      Plaintiff demands a trial by jury on all causes of action so triable.

9

10  DATED: June 11, 2010                        Respectfully Submitted,

11                                       **THE WESTON FIRM**

12

13                                     Jack Fitzgerald

14                                     2811 Sykes Court

                                           Santa Clara, CA 95051

15                                    Telephone:  (408) 459-0305

16                                     Gregory Weston

                                           888 Turquoise Street

17                                    San Diego, California 92109

                                         Telephone: (858) 488-1672

18                                    Facsimile: (480) 247-4553

19                                    **BECK & LEE BUSINESS**

                                       **TRIAL LAWYERS**

20                                    Jared H. Beck

                                         Elizabeth Lee Beck

21                                  28 West Flagler Street, Suite 555

                                       Miami, FL 33130

22                                    Telephone: (305) 789-0072

                                       Facsimile: (786) 664-3334

23

24                                  ***Counsel for Plaintiff Stuart Logan***

                                    ***and the Proposed Class***

25

26

27

28                                  21